IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RODNEY M. BECK, | ) |
| | ) |
| Plaintiff, | )   2:19-cv-01348 |
| | ) |
| vs. | ) |
| | ) |
| BROOKVILLE BEHAVIORAL HEALTH, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

Plaintiff Rodney M. Beck ("Beck") alleges that he was terminated from his employment by Defendant Brookville Behavioral Health, Inc. ("Brookville") in violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12117 (ADA), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA). Brookville denies any liability to Beck.

Presently pending is Brookville's motion for summary judgment (ECF No. 26). For the reasons that follow, its motion will be denied.[1]

### I.   Brief Procedural History

Beck commenced this action in October 2019. In Count I, he alleges that his termination constituted disability discrimination in violation of the ADA. Count II asserts the same claim under the PHRA.

Following the completion of discovery, Brookville moved for summary judgment (ECF No. 26), and its motion has been fully briefed (ECF Nos. 27, 30, 37).

---

[1] The parties have consented to full jurisdiction by a magistrate judge (ECF Nos. 9, 10).

## II.    Relevant Factual Background

### A.    Beck's Role and Responsibilities at Brookville

Beck began working for Brookville as a behavioral specialist consultant and mobile therapist in December 2014. In March 2018, he became its Program Director and Clinical Coordinator. (Defendant's Concise Statement of Material Facts ("DCSMF") ¶ 1.) He reported to Brookville Chief Executive Officer Ron Park. (*Id.* ¶ 2.)[2]

Brookville was and is a licensed outpatient program as it has historically provided behavioral health rehabilitative services. As Program Director, Beck worked with Lee Ann Kohler, a reviewer for the Pennsylvania Office of Mental Health and Substance Abuse in the Department of Human Services ("DHS"), who oversaw Brookville's licensing requirements. (*Id.* ¶ 3; PRDCSMF ¶ 3.) Kohler's job responsibilities with DHS include oversight of state licensing requirements associated with mental health programs and monitoring these programs. (DCSMF ¶ 4.)

During the transition of leadership in 2018, Kohler directly interacted with Beck and Park in order to educate them as to the expectations of an outpatient program such Brookville. Providers such as Brookville are required to complete updated policies and procedures in conformity with the requirements of DHS in order to maintain their state license. (*Id.* ¶ 6.) Kohler requested that Brookville's policies and procedures manual be updated at her very first interaction with Beck and Park. Kohler communicated with Park and Beck multiple times with regard to state licensing

---

[2] ECF No. 28. The parties disagree regarding the circumstances that led to this change in his position. Brookville asserts that Park requested that he take on this new role, and that the Board of Directors approved this decision. (*Id.* ¶ 2.) Beck states that the former president of Brookville's Board decided to appoint him as Program Director. (Plaintiff's Response to Defendant's Concise Statement of Material Facts ("PRDCSMF") (ECF No. 31) ¶ 2.).

requirements (*Id.* ¶ 9.)

As Brookville's Program Director, one of Beck's responsibilities in meeting Brookville's licensing requirements entailed updating its policies and procedures manual. (*Id.* ¶ 10.)[3] Kohler expected that the manual would be finished by the next time that she met with Beck about two weeks later. She later communicated to Beck on or about May 1, 2018 that the manual needed to be updated and finalized immediately. This never occurred during Beck's tenure as Program Director, however. (*Id.* ¶ 12.)

       B.  Issues Regarding Beck's Performance

The parties substantially disagree about issues related to updating Brookville's policies and procedures manual.  According to Brookville, Park periodically checked in with Beck to assess his progress in updating the manual and Beck informed him that the manual was being drafted. Brookville contends that these statements were untrue. (*Id.* ¶ 21.) Rather, Beck provided Kohler with an old version of the manual and misrepresented to her that it was an "updated" version. (DCSMF ¶ 11.) The document that he provided to Kohler had not been updated in accordance with state licensing requirements. (*Id.* ¶ 13.)

Kohler had serious concerns regarding Beck's performance and abilities as Program Director. She communicated her frustrations and concerns to Park, explaining that Beck had misrepresented his performance with regard to the manual. (*Id.* ¶15.) Kohler informed Park that

---

[3] Beck does not dispute this fact (PRDCSMF ¶ 10.) However, in his Concise Statement, Beck asserts that it was Park's responsibility to update the policies and procedures manual (Plaintiff's Statement of Material Facts Precluding Summary Judgment ("PSMFPSJ") (ECF No. 32) ¶ 21.) Brookville disputes Beck's statement (Defendant's Response to Plaintiff's Statement of Material Facts ("DRPSMF") (ECF No. 36) ¶ 21), which is also contradicted by every other reference to this issue in the record, including the record citation Beck provides, which is his own deposition testimony.  In that deposition excerpt, Beck testified that he was tasked with this assignment by Kohler. (Beck Dep. (ECF No. 33 Ex. 1) 41:5-10.) The Court concludes that the record confirms that updating the manual was Beck's responsibility, not that of Park.

Beck had failed to make any progress with regard to the manual and attempted to pass off an old version for one that was newly drafted. (*Id.* ¶ 22.) After Park confronted Beck about his lack of progress, Beck attempted to shift his own responsibilities with respect to the manual to his staff. (*Id.* ¶ 23.)

By contrast, according to Beck, during Kohler's mid-July 2018 visit, he provided her with Brookville's policy documents and asked her if she believed those policies should be updated. The documents provided by Beck were policies and procedures in place that Beck had gathered from the limited information he had. Beck asserts that these documents were never represented by him to be new policies. These were documents about which Beck had questions of Kohler concerning whether they were policies that could be updated currently. Kohler told Beck he needed to speed up the process of rewriting policy manuals, but Beck informed Kohler that he needed to talk to Park about the timing. (PRDCSMF ¶¶ 20-24.)

Beck states that the decision not to update those policies as quickly as Kohler preferred was made by Park. According to Beck, Park instructed Beck in early May to begin his review and recreation of the manual but did not give Beck a deadline for completion of this work. Shortly after Beck began to identify policies and procedures that were not in line with current regulations, Park instructed Beck that until a permanent human resources director was hired, he should not proceed any further other than to determine what new policies were needed. Brookville did not hire a new HR director before Beck was terminated. (*Id.*)

Thus, Beck asserts, he waited for the retention of a new HR director, he reviewed older policies in order to determine what needed to be updated. As Park was off work for extensive periods between May and July 2018 and unavailable to answer Beck's questions, it was difficult for Beck to know which policies were new and which were older. Beck also denies asking others

to do his work;  rather, he asked for input from his subordinates so he could determine if the policies in each area could be updated. (*Id.*)

As Brookville points out, Beck did not tell Kohler that Park had instructed him to stop working on new policies. (DRPSMF ¶ 41.) Beck notes, however, that Park did not inform Kohler that he told Beck to hold off on developing new policies pending the hiring of a new HR director. (PRDCSMF ¶¶ 10-15.)[4]

In addition to issues related to the manual, Park also learned that Beck had falsely stated that "TherapyNotes," an online client database system scheduled for implementation, was ready to "go live." (DCSMF ¶ 20.) After being told by Beck that "TherapyNotes" was ready, Park learned that, in fact, the program was not even close to complete. Beck had been tasked with handling TherapyNotes in April or May 2018. (*Id.* ¶ 24.)

Park also learned of concerns regarding Beck's behavior and job performance from other employees. (DCSMF ¶¶ 25, 26.)  Beck had falsely represented in his time sheets that he attended meetings when, in fact, he had not done so. He also failed to timely appear at a meeting in which he was required to terminate a therapist. (*Id.* ¶ 27.)[5] Beck notes that this issue was never raised with him. (PRDCSMF ¶ 27.)

Park was also advised that Beck used his cellphone to communicate with women on "match.com" during work hours and showed an employee a topless individual from the website.

---

[4] Brookville disputes Beck's contention that Park told Beck to stop working on the policies and procedures manual (DRPSMF ¶¶ 41-43). However, its support for this denial is Beck's deposition testimony that Park "never told me to stop work on them. He told me not to develop anything new and only identify … what I thought was not in spec at the time." (Beck Dep. (ECF No. 33-1 Ex.1) 45:10-13.)

[5] Beck "disputes" both of these statements this statement (PRDCSMF ¶¶ 26, 27), but does not cite to any evidence of record.

(DCSMF ¶ 28.) Beck again asserts that Defendant never raised this issue with him. (PRDCSMF ¶ 28.)

Other employees raised issues regarding Beck attempting to delegate his responsibilities to them or a lack of communication or support. (DCSMF ¶¶ 29-32.) Beck asserts that he was seeking input from his subordinates, not delegating his work to them. (PRDCSMF ¶¶ 29-32.)

Brookville also claims that aside from Beck's dishonesty and poor job performance as the Program Director, there were occasions when he inappropriately contacted Kohler after hours. Kohler blocked his number because she felt that Beck was attempting to "manipulate" her as she is a state official tasked with enforcing Brookville's licensing requirements.[6] Beck notes that Kohler did not state that she had a problem with him contacting her after hours while he was working at Brookville.[7] Brookville did not identify this issue as a reason for his termination. (PRCDSMF ¶¶ 16-17.)[8]

C. Park's Comments About Beck

Beck has a disability as a result of birth defect that caused him to sustain bone, muscle and nerve damage in his right arm and shoulder. He cannot use his right hand. He is substantially limited from performing any actions that would require dexterity in the use of both hands or that would require reaching behind him, to the right side, or downward. (PSMFPSJ ¶¶ 1-2.)[9]

---

[6] She may have advised Park about Beck contacting inappropriately contacting her after-hours. (DCSMF ¶¶ 16-17.) She testified that she could not recall if she told Park about this. (Kohler Dep. (ECF No. 33 Ex. 8) 41-42.)

[7] According to Kohler, she had a problem with him contacting her about his lawsuit after he was terminated. (Kohler Dep. (ECF No. 33 Ex. 8) 39-41.)

[8] In response to Beck's Concise Statement to this effect (PSMFPSJ ¶ 82), Brookville claims that Park testified about it at the Unemployment Compensation Hearing (DRPSMF ¶ 82). Park's testimony was that Beck had "lied to me about a phone call that he had made to her." (ECF No. 33-1 Ex. 2 at 17-18.)

[9] Defendant disputes this statement, contending that Beck testified only about his typing limitations (DRPSMF ¶¶ 1-2), but this is not an accurate summary of his testimony.

According to Beck, Park, who became Brookville's CEO in March 2018, mocked and ridiculed Beck's disability both at work and during meetings outside of work with his subordinates. (*Id.* ¶¶ 4, 5.) Park referred to Beck as his "right hand man who did not even have a good right hand of his own," and would say that it was "funny" because he "never believed his right hand man would be a guy who didn't have a right hand–you know, a cripple." (*Id.* ¶ 6.) Park repeatedly referred to Beck as a "cripple" both to Beck and other employees and during meetings with Defendant's providers. These kinds of comments, as well as referring to Beck as a "gimp," were made by Park on a weekly basis. (*Id.* ¶¶ 9-10.) Park also would ask Beck if he ever became tired of "jacking-off" with his left hand, and speculated to Beck's co-workers that Beck must not be able to masturbate because he could not reach his penis due to his short right hand. (*Id.* ¶¶ 7-8.)

Notably, Park also asked Beck if his work on the policies he was in the process of re-writing or updating was being delayed because of Beck's "crippled arm." (*Id.* ¶ 22.)

Park's comments were made to various Brookville employees, including Susannah Volpe, John Sharp and Zachary Kruise. During Volpe's job interview in April 2018, Park referred to Beck as his right hand man, which he characterized as funny because he "never believed that his right hand man would be a guy who didn't have a right hand—you know, a cripple." Later, after Volpe was hired, Park commented that it was funny that Beck was his right-hand man since he didn't have a right hand and referred to Beck as crippled. Volpe witnessed this kind of conduct by Park on more than ten occasions between April and August 2018. (*Id.* ¶¶ 11-15.). Park also stated to Sharp that Beck could not masturbate because he could not reach his penis due to his short right hand. (*Id.* ¶¶ 16-17.) Park told Kruise that Beck must have a hard time masturbating with his little arm. (*Id.* ¶¶ 18-19.)

Although Beck complained to Park that he found such comments to be offensive, the

conduct continued. (*Id.* ¶ 20.)

Park vehemently denies making these statements. In addition, Brookville points out that neither other employees nor Kohler heard Park make any such comments. (DRPSMF ¶¶ 5-20, 22.) However, Brookville does not dispute the cited testimony of Beck, Volpe, Sharp and Kruise.

       D.   Beck's Termination

At a Board meeting on July 30, 2018, Park discussed Beck's performance with the Brookville Board of Directors. Mary Reiter, a Brookville Board member, recalled Park raising concerns with regard to Beck's performance during this meeting. (DCSMF ¶ 33.) Park expressed to the Board that Beck had improperly delegated tasks, contacted a state official after-hours and lied to her, was untruthful about the status of the policies and procedures manual, and had lied about implementing a computer software program. (*Id.* ¶ 34.) Fellow Board member Deneise Strouse understood that Beck was supposed to have been creating new policies and procedures for Brookville in order to meet state licensing requirements, but he had failed to do so. (*Id.* ¶ 36.) Donald Zimmerman, another Board member, voted to terminate Beck because he had misrepresented his progress on work projects, including his progress with regard to the policies and procedures manual. He had also become aware that Beck had inappropriately contacted a state licensing official, Lee Ann Kohler, after-hours. (*Id.* ¶ 37.)

The Board unanimously voted on July 20, 2018 to terminate Beck. (*Id.* ¶ 35.)[10]

Park informed Beck on July 31, 2018 that the Board of Directors has unanimously voted in favor of his termination. (DCSMF ¶ 18.) Park states that he explained to Beck that the decision

---

[10] Beck asserts that the Board members were responding to information given to them only by Park, no one on the Board recalls Park suggesting that Beck be demoted or transferred rather than fired and Zimmerman acknowledged that, because of his advanced age, he remembers little about this Board meeting. (PRDCSMF ¶¶ 33-37.)

was made due to his job performance as Program Director and his dishonesty with Kohler regarding the policies and procedures manual. (*Id.* ¶ 19.)

Beck counters that Park told him he was being fired because Beck was "after [Park's] job" and that Park offered no further explanation for his termination. Beck further asserts that the reasons for his termination have been a moving target. During a hearing before the Pennsylvania Unemployment Compensation Board of Review, however, Park stated that Beck had been fired because he lied three times in July 2018. During this litigation, Brookville asserted that it fired Beck both because he made false statements to Park regarding projects he was required to complete, and because of his "failure to perform his functions as Program Director at the specific direction of Park." (*Id.* ¶ 19.)

Moreover, there are conflicting facts in the record regarding the decision itself. Park testified that he did not recommend that Beck be terminated, but only asked Brookville's Board of Directors to move Beck to another position. Asked to identify who decided to fire Beck, Brookville stated in an interrogatory answer that that "Park recommended that the Board fire Beck." Park now claims that the verified interrogatory answer that he recommended Beck's discharge is "inaccurate." Park now also denies that he recommended just demoting Beck. (PRDCSMF ¶¶27-35.)[11]

## III.   Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may

---

[11]In response to Beck's assertions in his Concise Statement about the changing nature of what Park said to the Board (PSMFPSJ ¶¶ 27-35), Brookville states only that the Board made the decision to fire Beck (DRPSMF ¶¶ 27-35).

be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**IV.    Discussion**

In Count I of the Complaint, Plaintiff asserts a claim of disability discrimination under ADA. He makes the same claim under the PHRA in Count II. Pursuant to the provisions of Title I of the ADA:  "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring,

10

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The same is true under the provisions of the PHRA, 43 P.S. § 953.

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). *See Lawrence v. National Westminster Bank N.J.*, 98 F.3d 61, 68-69 (3d Cir. 1996).[12]

> As the Court of Appeals for the Third Circuit has stated:
>
> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action…

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

Brookville argues that Beck cannot state a prima facie case because the reason for his termination was his poor job performance and there is no evidence of pretext. However, Beck meets all of the necessary elements of a prima facie case: he has a disability, was qualified for his position, was subjected to an adverse employment action when he was terminated and has pointed to circumstances that raise an inference of discriminatory action, that is, Park's offensive comments. *See Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1421 (M.D. Ala. 1995) (evidence that employee's manager mocked his disability met the final prong of the employee's prima facie case).

The burden of production then shifts to Brookville to articulate a legitimate, non-

---

[12] The same burden shifting analysis applies to claims under the PHRA. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010).

discriminatory reason for its action. It has proffered as its legitimate, non-discriminatory reason for Beck's termination various issues relating to his job performance, including his failure to update the policies and procedures manual and his misrepresentations that he had done so. Thus, Brookville has satisfied its relatively light burden of production. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997). The burden then shifts back to Beck to proffer evidence from which the trier of fact could conclude that Brookville's reasons for his termination are a pretext for unlawful disability discrimination.

The Court of Appeals has explained that:

> to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Beck proceeds along "*Fuentes* prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve Brookville's articulated legitimate reason. *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). He also proceeds along "*Fuentes* prong two" by arguing that he has proffered evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Keller*, 130 F.3d at 1111. The test is "disjunctive" and either prong is sufficient; all of the evidence must be considered as a whole. *Snooks v. Duquesne Light Co.*, 314 F. App'x 499, 505 (3d Cir. 2009).

As the Supreme Court has indicated, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). The court must

disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 151.

A. <u>Fuentes Prong One</u>

To challenge Brookville's proffered reason for his termination, Beck makes two arguments. First, he challenges the "core facts" surrounding his termination, that is, issues related to the updating of the policies and procedures manual.

When an employee contradicts the "core facts" surrounding the adverse employment action, the trier of fact may believe the employee and conclude that the proffered reason is a pretext for unlawful discrimination. *See Tomasso v. Boeing Co.*, 445 F.3d 702, 709-10 (3d Cir. 2006). Here, Beck testified that Park clearly instructed him to stop creating new policies and procedures and then recommended that the Board terminate Beck for not having made sufficient progress on the new policies and procedures manual. Simply put, it is Beck's position that Park recommended firing Beck despite the fact that Beck was actually following Park's instructions, information that Park conveyed neither to Kohler nor the Board. Thus, the factfinder could believe Beck and disbelieve Park and therefore conclude that Park was setting Beck up to fail. *See also DiIenno v. Goodwill Industries of Mid-Eastern Pa.*, 162 F.3d 235, 236 (3d Cir. 1998) (forcing worker to do job she could not, and thereby setting her up to fail, was an adverse employment action).

Second, Beck points to the shifting and inconsistent reasons for his termination, as well as the identity of the decision maker. "If a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 284 (3d Cir. 2001); *Hugh v. Butler County Fam. YMCA*, 418 F.3d

265, 269 (3d Cir. 2005).

Beck asserts that the reasons for his termination have materially changed over time.  He claims that when Park told him he was fired, it was because Beck was "after Park's job." At the subsequent Unemployment Compensation Board of Review hearing, Park said the reason for Beck's termination was that he lied three times in July 2018. Brookville now claims that Beck was fired both because he made false statements to Park about projects he was required to complete and because of his "failure to perform his functions as Program Director … at the specific direction of Park." It is also notable that in its motion for summary judgment, Brookville discusses issues that Beck asserts were never raised with him during his employment, including his use of match.com during work hours, missing or being late for meetings and inappropriate contacts with Kohler after hours.

Beck contends that this constitutes "classic *Fuentes* inconsistency." *See Roney v. Allegheny Intermediate Unit*, 568 F. App'x 172, 174 (3d Cir. 2014) (various individuals involved in the decision could not agree on why the plaintiff was not rehired); *Fredriksen v. Consol Energy Inc.*, 2019 WL 2108099, at *7 (W.D. Pa. May 14, 2019) (plaintiff was first told she was not fired for performance issues, but in responding to the EEOC charge, the employer cited "conflicting management styles" and in his deposition, the CEO said he did not think she would be a good "team player").

In turn, Brookville contends that its reasons never changed: the decision was based on Beck's job performance issues, including his failure to update the policies and procedures manual and his misrepresentations about this issue. Park denies telling Beck that he was fired because he was "after Park's job" and notes that the minutes of the Board meeting reflect that the discussion concerned performance issues. Defendant asserts that what Beck cites as "inconsistencies" are

merely elaborations of his job performance issues.

Reviewing the evidence in the light most favorable to Beck, he has proffered evidence that inconsistent reasons were given for his termination. Moreover, the record reflects that both in this case and at the Unemployment Compensation Hearing (ECF No. 33 Ex. 2 at 13), Beck testified that Park told him he was "after his job." This is not related to Beck's job performance.[13]

Moreover, Beck also points to the shifting explanation of who made the decision to fire him. Park initially testified that he did not recommend that Beck be fired, but rather moved to another position.[14] Brookville then indicated that Park himself recommended Beck's termination to the Board.  Park denies this. In his deposition, Park described Brookville's interrogatory answer that he recommended Beck's discharge as "inaccurate." He also now denies having recommended that Beck be demoted. *See Cullen v. Select Med. Corp.*, 779 F. App'x 929, 932 (3d Cir. 2019) (inconsistencies as to who made the decision required denying summary judgment); *Roehrig v. W.G. Tomko, Inc.*, 2016 WL 2755177, at *4 (W.D. Pa. May 12, 2016) (same). *See also Sabbrese v. Lowe's Home Ctrs., Inc.*, 320 F. Supp. 2d 311, 326 (W.D. Pa. 2004) (finding "the fact that no one at Lowe's acknowledges making the ultimate decision to fire Sabbrese" weighed in favor of denying summary judgment).

Beck has pointed to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions such that a fact finder could reasonably disbelieve the employer's articulated legitimate reasons." *Fuentes*, 32 F.3d at 765. Therefore, based upon the substance of Beck's *Fuentes* prong one evidence, the motion for summary judgment will be denied.

---

[13]At his deposition, Park testified that after Beck was fired, he came to believe that Beck was after his job. (Park Dep. (ECF No. 33-1 Ex. 1) 22:2-4.)
[14] Park also testified at the Unemployment Compensation hearing that he had recommended moving Beck to another position but the Board insisted on firing him. (ECF No. 33-1 Ex. 2 at 6.)

B.  Fuentes Prong Two

Beck's *Fuentes* prong two evidence consists of the offensive comments made by Park about his arm. Not only has Beck testified about Park's frequent comments, but he has proffered evidence by three other Brookville employees who heard them as well. The fact that Park denies making the comments and other employees did not hear any such comments is immaterial since all inferences must be drawn in Beck's favor as the non-moving party. Indeed, the fact that some Brookville employees witnessed Park making inappropriate comments about Beck and others did not creates a genuine issue of material fact. *See Waldron v. SL Indus., Inc.*, 56 F.3d 491, 501 (3d Cir. 1995). Moreover, the fact that some individuals did not hear Park make any such remarks is not dispositive because evidence of unlawful discrimination may manifest itself in the presence of a victim or behind his back. *See Moore v. City of Phila.*, 461 F.3d 331, 345 (3d Cir. 2006).

As Brookville notes, the Court of Appeals has held that: "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Fuentes*, 32 F.3d at 767 (citation omitted). However, Park was Beck's supervisor and there is record evidence that Park was the person who recommended to the Board that Beck be fired.

As the Court of Appeals has held:

> "When considering whether remarks are probative of discrimination, we consider the speaker's position in the organization, the content and purpose of the statement, and the "temporal connection between the statement and the challenged employment action." *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997). Here, although several of the statements were made by LSS executives, they were temporally remote from the decision to discharge Appellants, and completely unrelated to the investigation regarding Appellants' violation of the EC Policy. Thus, the comments qualify as "stray remarks" and are entitled to minimal weight. *See Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

*Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238, 241 (3d Cir. 2011). At the same time,

16

"statements temporally remote from the decision at issue may properly be used to build a circumstantial case of discrimination." *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995).

Beck has pointed to evidence that Park, who was his supervisor and Brookville's CEO, repeatedly made disparaging remarks about his disability between April and July 2018, when he was fired. Indeed, Beck has indicated that, shortly before he was terminated, Park asked him if his work on updating Brookville's policies was being delayed as a result of his "crippled arm." Brookville cannot reasonably contend that as a matter of law, these comments were "temporally remote" from the decision to terminate Beck or were simply "stray remarks" when they were made repeatedly by a high-ranking supervisor who may have instigated Beck's termination.

Park's comments may be considered as part of Beck's evidence of pretext. *See Wilson*, 953 F. Supp. at 1422 (employees' mocking of plaintiff's hearing disability was considered with other evidence to demonstrate pretext); *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1109 (S.D. Ga. 1995) ("an employer is not free to harass or abuse a disabled individual over the direct consequences of his disability any more than the employer is free to call him a 'gimp' or other epithets."); *U.S. Equal Emp. Opportunity Comm'n v. Big Lots Stores, Inc.*, 2018 WL 4656413, at *4 (N.D.W. Va. Sept. 27, 2018) (alleged harassers regularly referred to plaintiff's hearing and speech impairments in derogatory ways while harassing her).

In support of its position, Brookville cites *Wright v. Providence Care Center, LLC*, 2019 WL 4643592 (W.D. Pa. Sept. 24, 2019), *aff'd mem.*, 822 F. App'x 85 (3d Cir. 2020). In that case, the plaintiff claimed that a supervisor said that she did not believe plaintiff could work and should go on Social Security disability. *Id.* at *2. The court concluded that: 1) this was a "stray remark" because it was made more than two months before plaintiff's termination; 2) it was uttered by only

one of three supervisors who were involved in the decision to terminate her; and 3) because it was made after she returned from medical leave, it was equally susceptible of an innocent expression of concern for an employee struggling with serious medical conditions. *Id.* at *6. Therefore, the court concluded that the remark did not constitute "direct" evidence of discrimination but could still be considered as part of Wright's circumstantial case.[15]

Defendant also relies upon *Drwal v. Borough of West View, Pa.*, 617 F. Supp. 2d 397 (W.D. Pa. 2009). In *Drwal*, the plaintiff contended that he was ridiculed and mocked by his fellow officers because of his multiple sclerosis. The court held that these allegations were insufficient to support a claim of hostile work environment. It reasoned that the comment that plaintiff was not being considered for a proposed team because of his MS was a "stray remark" and not probative evidence of discriminatory intent because the source of the comment was not a decisionmaker within the hierarchy of the police department and his comment was not related to the adverse employment actions alleged. *Id.* at 417.

Neither of these decisions support Brookville's arguments in this case. CEO Park was Beck's direct supervisor. The alleged comments by Park ("gimp," "cripple," a "right-hand man … who didn't even have a right hand") are not susceptible of an innocent expression of concern as were the comments in *Wright*.[16] Nor is Beck offering these comments as direct evidence of discrimination, but as circumstantial evidence to be considered along with his other proffered

---

[15] Ultimately, the plaintiff failed to demonstrate pretext because she was fired after she engaged in a loud argument with fellow employee, who was also fired, and she could not point to comparators who received more favorable treatment under similar circumstances.

[16] Interestingly, the court in *Wright* contrasted the language with that cited by the plaintiff in *Mangel v. Graham Packaging Co., LP*, 2016 WL 1266257, at *5 (W.D. Pa. Apr. 1, 2016), in which the plaintiff's co-workers "made fun of his limp and leg braces, calling him 'Forrest Gump,' 'cripple,' 'Gumby,' and 'crippled ninja'" and his supervisor called him "ratchet ass" and "Gumby," all of which were corroborated by a co-worker. *Wright*, 2019 WL 4643592, at *12 & n.2.

evidence.[17]

Moreover, the fact that the Board made the actual decision to fire Beck is not dispositive because the sole basis for the Board's decision was the information given to them by Park. There is no evidence that the Board conducted an independent investigation or review of Beck's performance. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 515 (3d Cir. 1997) (noting that an individual in the "direct chain of command" can be a part of the decision-making process).

Finally, even if Park had not been Beck's supervisor and Brookville's CEO, his actions could still subject Brookville to liability because "if a supervisor performs an act motivated by … animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (footnote omitted). *See also Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 330-31 (3d Cir. 2015) (employer can be held liable based on its reliance on facts provided by biased supervisor). Beck has pointed to evidence of disability animus by Park, and it is undisputed that Park's actions led to Beck's termination by the Board. Thus, the jury could conclude that Park's recommendation to the Board to terminate Beck was motivated by discriminatory animus and intended to cause the adverse employment action that resulted.

Thus, Beck has proffered evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Keller*, 130 F.3d at 1111. Therefore, Brookville's motion for summary judgment also fails based upon Beck's *Fuentes* prong two evidence.

---

[17] The Court expresses no view on whether the comments allegedly made by Park would be sufficient to constitute direct evidence of disability discrimination.

19

## V.    Conclusion

For these reasons, Brookville's Motion for Summary Judgment will be denied. An appropriate order will follow.


Dated: April 2, 2021.                              BY THE COURT:

                                                   s/ Patricia L Dodge
                                                   PATRICIA L. DODGE
                                                   United States Magistrate Judge